UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TRACY L. CASKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO. 1: 04-cv-1239-DFH-TAB |
| | ) | |
| COLGATE-PALMOLIVE COMPANY | ) | |
| and HILL'S PET NUTRITION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Tracy Caskey worked as an employee at defendant Hill's Pet Nutrition, Inc. ("Hill's"), a manufacturer of pet food. Defendant Colgate-Palmolive is the parent company of Hill's. Caskey was terminated by Hill's in May 2003. Caskey alleges that defendants interfered with the exercise of her statutory right to medical leave pursuant to the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* She also alleges that she was subjected to discrimination based on her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Caskey also alleges that defendants retaliated against her for exercising her rights under Title VII, the FMLA, and Indiana law. Defendants contend that all of Caskey's discipline was lawful and that her termination resulted from three consecutive unexcused absences from work.

Defendants have moved for summary judgment on all claims.  As explained below, the court grants the motion.  Caskey has failed to raise a genuine issue of fact that she was improperly denied FMLA leave on any occasion.  Caskey also has failed to identify a genuine issue that she was discriminated against because of her sex in violation of Title VII.  Finally, Caskey has failed to identify a genuine issue that Hill's retaliated against her for engaging in activity protected by Title VII or the FMLA, and she has failed to come forward with evidence that Hill's retaliated against her for filing a worker's compensation claim.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Only genuine disputes over material facts can prevent a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id.* at 248-49.

-2-

On a motion for summary judgment, the moving parties must first come forward and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which the parties believe demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Where the moving parties have met the threshold burden of supporting the motion, the opposing party must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Local Rule 56.1 requires the party opposing a motion for summary judgment to identify specific and material factual disputes.

When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party.  See *Liberty Lobby*, 477 U.S. at 255; *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999).  However, a party must present more than mere speculation or conjecture to defeat a summary judgment motion.  The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record.  *Liberty Lobby*, 477 U.S. at 252; *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001).

*Facts for Summary Judgment*

The following facts are either undisputed or reflect the evidence in the light most favorable to plaintiff Caskey as the party opposing summary judgment.

Adverse facts established by defendants beyond reasonable dispute are necessarily included in the narrative.

In March 1995, plaintiff Tracy L. (Greye) Caskey began working as a technician in Hill's Pet Nutrition plant in Richmond, Indiana. Caskey Aff. ¶¶ 2, 3. The production areas at Hill's Richmond plant include Dry Mix/Bulk, Processing, Packaging, and Stretchwrap. Zaleha Aff. ¶ 3. From early 2002 through Caskey's termination, area leaders (formerly known as team leaders) supervised technicians working in the different production areas. Area leaders reported directly to operations manager Darren Haverkamp. *Id.* ¶ 4. Haverkamp, human resources director Jackie Vanderpool, and human resources manager Michael Keinath reported directly to plant manager Cathy Zaleha. *Id.* ¶¶ 1, 5.

Because Hill's provides paid leave for illness under the FMLA and has other paid time-off programs, it does not also provide employees with "sick days." Zaleha Aff. ¶ 12. An absence that does not count as FMLA or another form of protected leave is recorded as an unexcused absence. *Id.* ¶ 13.

Work performance issues at Hill's are addressed through the Individual Improvement Process ("IIP"), a tiered disciplinary system comprised of the following steps: formal coaching, performance agreement, decision-making leave ("DML"), and "deselection" (*i.e.*, termination). Zaleha Aff. ¶ 10. This process was formerly called the Performance Improvement Process ("PIP"). *Id.* ¶ 9.

Caskey progressed through Hill's disciplinary process until she was ultimately terminated in May 2003. In November 2001, Caskey was placed in the first stage of PIP for excessive absences. Caskey Aff. Att. 34. On February 27, 2003, Caskey was placed in the performance agreement stage of IIP. Hill's claimed that Caskey had eighty-four hours of non-protected absences in a twelve-month period. Keinath Aff. ¶ 4; Caskey Aff. Att. 62.

On March 12, 2003, Caskey was placed in the DML stage of IIP. Caskey Aff. Att. 72. Hill's claimed that Caskey recently had committed unsafe behavior and had caused a quality problem. In February, Caskey slipped and fell on a wet floor when an extruder machine die swung toward her while she opened the machine to remove a plug. She broke her wrist and her injury was treated as a worker's compensation injury. Caskey I Dep. at 85. An Incident Investigation Team reported that the "root cause" of Caskey's accident was that she was standing on the "at-risk" side of the extruder. Caskey Aff. Att. 63. In early March, Caskey was responsible for performing quality control checks on a plant line producing kibble. During her shift, over 50,000 pounds of reject product were produced and approximately 20,000 pounds of this was bagged before the problem was discovered. Caskey II Dep. at 110, 124, 129; Doyle Dep. at 186.[1]

---

[1]Two depositions of the plaintiff are part of the record. The notation "Caskey I Dep." refers to the deposition taken on July 1, 2004. "Caskey II Dep." refers to the deposition taken on April 12, 2005.

Caskey's decision-making leave required that she "[h]ave no absences and use no emergency vacation time for the duration of the agreement." Caskey Aff. Att. 72 at 4. On the morning of April 12th, Caskey called the Hill's Plant from Texas to request vacation time for a shift that started the morning of April 14th. Hill's contended that Caskey's request violated the terms of her DML. Haverkamp and Keinath spoke with Caskey when she returned from Texas and obtained her oral agreement to adhere to the terms of her DML.

From April 24 through May 12, 2003, Caskey was on FMLA leave. Upon returning from FML, Caskey worked shifts on May 12 and 13, took a birthday holiday on May 16, took vacation on May 17 and 18, and did not report to work for her next three scheduled shifts – May 21, 22, and 27. Caskey I Dep. at 69; Caskey II Dep. at 7-8; Keinath Aff. ¶¶ 20, 21.

Caskey's performance agreement required that she "communicate to [her] Area Leader and team" any absence and that she not have any unexcused absences. Caskey Aff. Att. 62. Caskey testified that on the morning of May 21st, she called a teammate and told him she was "sick" and would not be in on the 21st or 22nd. Caskey's decision-making leave noted that failure to "maintain acceptable levels of performance . . . could result in termination." Caskey Aff. Att. 104. On May 29th, Hill's sent Caskey a letter stating that it deemed her to have "self-terminated" by not reporting to work on May 21, 22, and 27. Caskey Aff. Att. 117.

Caskey filed a charge with the EEOC on or about July 10, 2003.  Cplt. ¶ 30.
Additional facts are noted below, keeping in mind the standard that applies on
summary judgment.

*Discussion*

I.     *Colgate-Palmolive*

Colgate-Palmolive is entitled to summary judgment on all claims.  The
undisputed evidence shows that it was not Caskey's employer and did not direct
or control the acts of which she complains.

The FMLA protects eligible persons who work for a statutorily defined
"employer."  This includes "any person who acts, directly or indirectly, in the
interest of an employer to any of the employees of such employer."  29 U.S.C.
§ 2611(4)(A)(ii)(I).  The Seventh Circuit has not addressed the scope of this
provision in the context of the FMLA, so the court looks to cases interpreting
similar language from the Fair Labor Standards Act (FLSA).  See 29 U.S.C.
§ 203(d) (similar provision in FLSA); *Eckert v. Schroeder, Joseph & Associates*,
364 F. Supp. 2d 326, 328 n.1 (W.D.N.Y. 2005) (courts have looked to FLSA cases
in interpreting FMLA definition of employer).

Colgate could be found to be a proper defendant under the FLSA, and
therefore the FMLA, if it "had supervisory authority over the complaining employee

and was responsible in whole or in part for the alleged violation." *Smith v. Univ. of Chicago Hospitals*, 2003 WL 22757754, *6-7 (N.D. Ill. Nov. 20, 2003) (applying FLSA standards in deciding that section 2611(4)(A)(ii)(I) of FMLA allowed for individual liability), quoting *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987) (considering individual liability under FLSA); accord, *Eckert*, 364 F. Supp. 2d at 327-28 ("the language of § 2611(4)(A)(ii)(I) has been interpreted by a majority of the Courts to allow for liability under the FMLA against entities or individuals that 'possessed the power to control the worker in question'") (internal citation omitted).

Similarly, Colgate could be found to be a proper Title VII defendant:  (1) if Caskey could present evidence that Colgate maintained an employment relationship with her; (2) if Caskey could pierce the corporate veil and present evidence that the Hill's subsidiary is only an alter ego of the parent Colgate; or (3) if Caskey could present evidence that Colgate took actions to avoid liability under the discrimination laws or might have directed the discriminatory act, practice, or policy of which she complains.  *Worth v. Tyer*, 276 F.3d 249, 259-61 (7th Cir. 2001).  In *Worth v. Tyer*, the Seventh Circuit looked to the five factors of the "economic realities test" to determine whether an alleged victim of sexual harassment was an employee of the defendant and thus had a right to sue under Title VII:  (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work; (2) the type of job skills required to carry out the work and whether the skills are learned in the

workplace; (3) the responsibility for cost of the operation (*i.e.*, who pays for equipment, supplies, fees, licenses, workplace, and maintenance of operations); (4) the method and form of payment and benefits; and (5) the length of the job commitment and/or expectations.  276 F.3d at 263, citing *Knight v. United Farm Bureau Mutual Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991).  Of these five factors, the most important is the right to control and direct the worker's actions. *Id.*; accord, *Alexander v. Rush North Shore Medical Center*, 101 F.3d 487, 492-93 (7th Cir. 1996).

Caskey testified that from the time that she and other employees were hired at Hill's Richmond Plant, they were told that they were Colgate employees, that they needed to follow Colgate instructions, and that they should direct employment complaints to the Colgate hotline because Colgate "would investigate our complaints and take action for us."  Caskey Aff. ¶ 13 (also incorporating co-worker affidavit and deposition testimony).  Despite Caskey's own characterization of her employment situation, she has produced no evidence of objective control of Hill's employees by Colgate.  Caskey testified that part of her salary was paid in Colgate preferred stock, see Caskey Aff. ¶ 13, but she received her salary and all benefits from Hill's.  Keinath Aff. ¶ 23; Zaleha Aff. ¶ 17.  Although Hill's employees were obliged to follow Colgate's Code of Conduct, see Caskey Aff. ¶ 17, Hill's controlled the discipline, scheduling, and assignment of work for the employees in its Richmond Plant.  Keinath Aff. ¶¶ 24-25; Zaleha Aff. ¶¶ 18-19.  None of Caskey's citations to the record raise an issue of material fact as to whether

Colgate controlled or directed any of the decisions relevant to this case, such as Caskey's work, her discipline, or the handling of her FMLA and worker's compensation claims.

Caskey points out that Colgate introduced the Employee Assistance Program (see Caskey Aff. Att. 14) and that she participated in the program for depression, which she believes warranted FMLA leave. Caskey also points out that Colgate provided the Disability Benefits Program and she argues that a denial of disability benefits in 2003 led to her termination. See Caskey Aff. ¶ 260. Caskey's own evidence shows that a third-party provider, and not Colgate, made her disability benefits determination. See *id.* ¶ 279. Finally, Caskey claims that Colgate supervised the safety performance of the Hill's Plant and that she was forced to "work with pain" after injuring her wrist in 2002 because accepting prescription medication would have counted as a recordable incident. *Id.* ¶¶ 128-31, 143-53. Caskey cites no specific evidence to support her claim about Colgate's involvement in plant safety. Regardless, all of these connections with Colgate are too attenuated to implicate Colgate in any of the actions that form the basis of Caskey's claims.

Caskey has not provided factual evidence tending to show that she was an employee of Colgate. Caskey also has not provided any evidence to pierce the corporate veil or to implicate Colgate in the alleged illegal or discriminatory

actions.   Colgate-Palmolive's motion for summary judgment is granted and Colgate-Palmolive is dismissed as a defendant.[2]

## II.   *FMLA Entitlement Claim*

The FMLA grants eligible employees the right to twelve work-weeks of unpaid leave for specified reasons during any twelve-month period.  Among those reasons is a "serious health condition" that makes the employee unable to perform the functions of his or her position.  29 U.S.C. § 2612 (a)(1)(D).  The Act makes it unlawful for employers to interfere with, restrain, or deny the exercise of any right provided by the Act.  29 U.S.C. § 2615(a)(1).  It also prohibits employers from discriminating or retaliating against employees who oppose practices made unlawful by the Act.  29 U.S.C. § 2615(a)(2).

The FMLA requires that a plaintiff bring suit within two years of an alleged non-willful violation of the Act.  29 U.S.C. § 2617(c)(1).  Because Caskey filed this suit on July 28, 2004, she may not rely on events occurring before July 28, 2002 to support her FMLA claim.  Accordingly, the court does not consider Caskey's complaint about a reduced bonus in 2000 for taking FMLA leave.  See Caskey Aff. ¶ 120, Atts. 29 & 30.  The court also does not consider Caskey's complaint about

---

[2]This court previously has found that Colgate was not a proper defendant in three recent cases involving similar claims brought by Hill's employees.  See summary judgment entries in:  *Isaacs v. Colgate-Palmolive Co.*, No. 1:03-cv-348 (Mar. 31, 2006) (McKinney, J.); *Brown v. Colgate-Palmolive Co.*, No. 1:04-cv-782 (Mar. 2, 2006) (Hamilton, J.); *Bright v. Colgate-Palmolive Co.*, No. 1:03-cv-1709 (July 26, 2005) (Hamilton, J.).

denial of FMLA leave for her October 1, 2001 absence from work.  See Caskey Aff. ¶¶ 132-35.  The court addresses Caskey's remaining allegations that are not time-barred in chronological order.

A.    *January 6 and 7, 2003 Absence*s

Caskey was absent from work on January 6th and 7th, 2003.  Caskey testified that she suffered from an upper respiratory infection and sinusitis.  Caskey Aff. ¶¶ 155-60.  Her treating physician released her to return to work on January 8th.  See Caskey Aff. Att. 56.  Hill's gave Caskey an FMLA packet and gave her until February 11th to submit a medical certification from her physician.

Caskey did not submit her certification by February 11th.  Nevertheless, Hill's management employee Shelly Culbertson spoke with Caskey on the 11th and gave her an additional day to return the certification.  See Caskey Aff. Att. 57.  On February 13th, Culbertson reported that Caskey's paperwork had not yet been received and that Caskey's absences would not be FMLA-protected.  *Id.*  Caskey testified that her physician signed the certification on February 12th, but she did not testify that she ever submitted this certification to Hill's.

The undisputed facts show that Hill's did not violate the FMLA by counting Caskey's absences on January 6th and January 7th as non-FMLA leave.  If an employer requests a medical certification for absences and the employee never produces the certification, the absences need not be treated as FML.  See

29 C.F.R. § 825.311(b); *Rager v. Dade Behring, Inc.*, 210 F.3d 776, 778-79 (7th Cir. 2000) (affirming summary judgment for employer when certification was not timely submitted).   Caskey appears to argue that she should have been given additional time to submit her certification, but the regulations require an employee to submit a requested certification within the time frame given by the employer (as long as it is at least 15 days after the employer's request), unless it is not practicable under the particular circumstances. See 29 C.F.R. § 825.305(b). The undisputed evidence shows that Caskey was given at least 15 days from the date that Hill's requested her certification, and Caskey has not argued that it was impracticable for her to submit her certification in a timely fashion.

Caskey also has not offered any evidence that her absences on January 6th and 7th were FML-qualifying.   See 29 C.F.R. § 825.114(a) ("serious health condition" requires inpatient care or period of incapacity of more than three consecutive days and continuing treatment by a health care provider).   The burden of proof on a claim brought under the substantive rights provision of the FMLA lies with the plaintiff, who must demonstrate by a preponderance of the evidence her entitlement to the disputed leave. *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir. 1997) (affirming summary judgment for former employer on FMLA claim).   At the summary judgment stage, the plaintiff must make at least a threshold showing that she suffered from a "serious health condition." *Haefling v. United Parcel Service, Inc.*, 169 F.3d 494, 499 (7th Cir. 1999) ("Whether an illness or injury constitutes a 'serious health condition' under

the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging his condition to be so."). Caskey's testimony that she suffered from an upper respiratory infection and sinusitis is insufficient. No reasonable fact-finder could conclude from the evidence that Caskey was entitled to FMLA leave for her two days of absences in January 2003.

B.    *February 22 and 23, 2003 Absences*

On February 21, 2003, Caskey injured her wrist at work and was taken to the emergency room by a Hill's safety team leader. Caskey Aff. ¶¶ 163-70. Her right arm was put in a cast. Caskey returned to work that same day and tried to work, but she became nauseous and left. She did not report to work for her next two scheduled shifts (February 22nd and 23rd). Caskey has offered no evidence that she contacted Hill's about leaving early on the 21st or about her subsequent absences.

Caskey now contends that her absences on February 22nd and 23rd should have been treated as FMLA leave. She argues that Hill's had notice of her broken wrist because her injury occurred at work and because a Hill's employee accompanied her to the emergency room.

Caskey's argument is not persuasive. On the day of her injury, Caskey received a medical release to perform light duty work. Caskey II Dep. at 146-47. That same day, she returned to work. Caskey Aff. ¶ 166. In light of these

circumstances, Hill's knowledge of the mere fact that she was injured, without more, was insufficient to put it on notice of a probable basis for FMLA leave. *Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 953 (7th Cir. 2004) (employee must give employer enough information to establish probable cause to believe she is entitled to FML).  Under the regulations, an employee must provide at least oral notice sufficient to make her employer aware that she needs FML, and information about the anticipated timing and duration of the leave.  29 C.F.R. § 825.302(c); *Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001) (holding that this provision applies even in situations where advance notice is not possible).  Caskey never provided this notice.

In addition, Caskey has not offered any evidence demonstrating that her condition on February 22nd and 23rd actually qualified for FMLA leave.  Again, she has not put forth evidence demonstrating that she received inpatient care or suffered a period of incapacity of more than three consecutive days and received continuous treatment by a health care provider.  Caskey was not entitled to FMLA leave for these two absences in February 2003.

C.    *April 24 through May 12, 2003 Absences*

On April 24, 2003, Caskey told Haverkamp that she was not coming into work because, among other reasons, she was going to see the doctor for problems with her nerves.  Caskey Aff. ¶ 243.  Caskey apparently did come into work, but Haverkamp told her that she was not fit to be there, that he was relieving her of

her duty with pay pending medical evaluation, and that he would be contacting her. *Id.* ¶ 244.  Caskey's family physician recommended that she be excused from work until May 12th for anxiety and depression.  *Id.* ¶¶ 248, 249, Atts. 94 & 97.

On May 8th, Caskey saw her physician for a follow-up appointment.  She released Caskey to return to work on May 12th without restrictions.  See Caskey Aff. Att. 100; Vosler Aff. ¶¶ 4, 5.  She also completed a certification for FMLA leave which stated that Caskey had suffered from "distress, shaking, and heart racing" and listed the duration of her condition from April 24th until May 12th.  See Caskey Aff. ¶ 254, Att. 101.  Caskey requested and received FMLA leave from Hill's for April 24 through May 12, 2003.  See Caskey Aff. ¶ 255, Att. 102.

Although Caskey received FMLA leave for these absences, she argues that her leave improperly affected later employment actions.  An employer cannot use FMLA leave as a negative factor in hiring, promotions, or disciplinary actions.  29 C.F.R. § 825.220(c).  The Act provides, however, that none of its restoration provisions "shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."  29 U.S.C. § 2614(a)(3)(B).

Caskey first argues that Hill's held her FMLA leave against her when it put her into her "second" decision-making leave.  See Pl. Br. at 43.  Caskey's May

decision-making leave paperwork stated that she was late for work on both April 23rd and 24th.  Caskey Aff. Att. 104.  Caskey argues that April 23rd was a decision-making leave day and that April 24th was approved as FML.  Caskey Aff. ¶ 257.  The paperwork also noted that Caskey took an emergency vacation day on April 6th in violation of her original decision-making leave agreement, but Caskey argues that this was a "lie."  *Id.* ¶ 256.

Caskey does not dispute that she was late on April 23rd and 24th, and the FMLA does not require Hill's to overlook this fact in assessing her work performance.  Caskey's tardiness on April 24th was independent of (and prior to) Hill's designation of that day as FMLA leave.  Also, Hill's contends that the reference to April 6th was a mistake because Caskey actually took an emergency vacation day on April 14th.  See Def. Rep. Br. at 45.  Caskey has not responded to Hill's explanation.  Most important, Caskey has not explained how an incorrectly marked absence for April 6th or her admitted tardiness on April 23rd implicate the protections of the FMLA, and the evidence she cites (without explanation) is not helpful in this matter.  See Caskey Aff. Atts. 115 & 124.  Finally, Caskey had already recommitted to the conditions of her decision-making leave before her FMLA leave began on April 24th.  Caskey's May paperwork was simply a confirmation of that agreement and did no more than identify additional performance failures.  Hill's did not violate the FMLA by considering Caskey's emergency vacation leave and tardiness in assessing her performance.

Caskey also argues that Hill's improperly used her April FML to disrupt her planned vacation time in mid-May.  At some point prior to May 16th, Caskey requested vacation days for May 17th and May 18th.  Caskey Aff. ¶ 259. According to Caskey, on May 16th, her team leader (Krista Doyle) and Hill's human resources manager (Keinath) told her that she could not take May 17th and 18th as vacation days because her short term disability for April 24th through May 12th had not yet been approved and the absence of this approval would cause a denial of FMLA leave for those dates.  *Id.* ¶ 260.  That would mean that Caskey's vacation days would be used toward those absences.  *Id.*  Keinath told Caskey that if she felt confident her short term disability benefits would be approved, she could go ahead and take off May 17th and May 18th.  *Id.* ¶ 263.

Caskey did not report to work on May 17th and 18th.  Caskey's short term disability benefits were eventually approved on May 21st.  Caskey Aff. ¶ 295, Att. 108.  Caskey complains that Hill's nevertheless treated May 17th and 18th as "absences."  See Caskey Aff. ¶ 265 (Att. 124); ¶ 297 (Att. 115).  She also complains that, in spite of the short term disability approval, Hill's counted her FML from May 2nd through May 12th as vacation days.  See Caskey Aff. ¶¶ 295-96, Atts. 108, 115, 116.

Caskey's arguments are undeveloped and unsupported by the evidence. With respect to her first complaint, Caskey cites to attendance records that are both unauthenticated and unclear.  These records show May 17th and 18th coded

as "PTO," but Caskey offers no explanation as to what this means.  Even if these days had been treated as "absences," Caskey has not explained what that means or how the absences were held against her since they did not precipitate her termination.    In  support  of  her  second  argument,  Caskey  also  cites unauthenticated attendance records.  The records show that May 2nd through May 12th were marked as FML running concurrent with vacation.  Caskey has not explained  how  this  designation  violated  the  FMLA  or  adversely  affected  her employment.  Caskey may not proceed on a claim that Hill's violated the FMLA without some showing of harm.  See, *e.g.*, *Harrell v. United States Postal Service*, 415 F.3d 700, 714-15 (7th Cir. 2005) (affirming summary judgment for employer on claim for FMLA violation that did not cause any harm to plaintiff), *modified on rehearing on other grounds*, — F.3d —, 2006 WL 1171889, *13 (7th Cir. May 4, 2006).  Caskey has not identified any adverse effects from Hill's handling of her April FML.

D.    *May 21, 22, and 27, 2003 Absences*

Following her vacation days on May 17th and May 18th, Caskey did not report to work for her next three scheduled shifts – on May 21st, 22nd, and 27th. Caskey claims that she was entitled to FML for these absences.  Caskey testified that around 6:10 a.m. on the morning of May 21st, she called fellow technician Ron Henson and told him that she was "sick" and would not be in to work that day.  Caskey I Dep. at 69; Caskey Aff. ¶¶ 275-78.  Caskey testified that Henson said "o.k."  Henson asked Caskey if she would be in the following day (May 22nd)

and she said she would not.  Caskey did not work on May 21st, 22nd, or 27th. Hill's sent Caskey a letter on May 29, 2003 stating that she was considered "self-terminated" for missing three consecutive days of work without calling into the Plant.  Caskey Aff. ¶ 302, Att. 117; Doyle Dep. at 211-13, Ex. 23.

Caskey cannot show that she was entitled to FMLA leave for these three absences both because she never gave notice to Hill's that she was seeking FMLA leave and because she has not produced evidence demonstrating that her absences qualified for FMLA leave.

First, Caskey's statement that she was "sick" was insufficient to put Hill's on notice that she was requesting FMLA leave. See 29 C.F.R. § 825.303; *Collins v. NTN-Bower Corp.*, 272 F.3d 1006 (7th Cir. 2001); see also *Levine v. Children's Museum of Indianapolis, Inc.*, 2002 WL 1800254, *8-9 (S.D. Ind. July 1, 2002), *aff'd*, 2003 WL 1545156 (7th Cir. Mar. 24, 2003).  Caskey's case is controlled by *Collins*.  In *Collins*, the Seventh Circuit affirmed summary judgment in favor of an employer on an FMLA claim brought by an employee who had been discharged for two consecutive absences.  The employee had called in and reported that she was "sick" and the court held that this statement was insufficient notice of a request for FMLA-qualifying leave.  Like Caskey, the plaintiff in *Collins* suffered from a sometimes incapacitating mental condition of which the employer had previous knowledge.  Also like Caskey, the plaintiff had received numerous warnings for attendance problems before her termination.  As in *Collins*, Caskey "could have

made clear the 'serious' nature of her condition by referring to knowledge already in the employer's possession.  A reference to being 'sick' not only withheld important information from the employer but likely threw it off the scent." 272 F.3d at 1008-09; cf. *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 852 (8th Cir. 2002) (employee's statement that she would not be into work because of "depression again" created issue of fact about sufficiency of notice under FMLA); *Miller v. GB Sales & Service, Inc.*, 275 F. Supp. 2d 823, 829-30 (E.D. Mich. 2003) (employer's knowledge of employee's chronic serious health conditions of diabetes and depression, for which she had previously taken FML, put burden on employer to inquire whether leave was FMLA-qualifying when employee submitted doctors' notes and otherwise provided supervisors with enough information to conclude she was experiencing problems related to diabetes and/or depression).

Caskey's case presents a stronger case for denying FMLA leave than *Collins*. First, the FMLA regulations provide that an employer may require an employee to comply with its "usual and customary" notice and procedural requirements when requesting FMLA leave.  29 C.F.R. § 825.302(d); see also *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 710 (7th Cir. 2002).  Caskey admits that the terms of her original decision-making leave required that she communicate any absence to her area leader.  Pl. Br. at 19.  Caskey did not contact her Area Leader Krista Doyle on May 21st, but instead called a technician on her team.  She provided no notice at all about her May 27th absence.

Second, Caskey has not offered any evidence that her absences qualified for FMLA leave.  In *Collins*, the court focused only on the question of notice and did not decide whether the plaintiff suffered from a "serious health condition" within the meaning of the Act.  The plaintiff's physician, however, had testified that she was incapacitated by depression between 10 and 20 percent of the time.  272 F.3d at 1007.  In this case, Caskey has offered no medical evidence of incapacitation and testified only generally that she was unable to care for her children, leave her house, work, or function (and only on May 21st).  Caskey Aff. ¶ 274; see *Haefling*, 169 F.3d at 500 (plaintiff's "own self-serving assertions regarding the severity of his medical condition and the treatment it required are insufficient to raise an issue of fact on this point").

Caskey points to evidence that she was certified as suffering from FMLA-qualifying depression and anxiety from April 24th through May 12th.  But the evidence does not demonstrate that this was necessarily a chronic condition.  Caskey was under no restrictions from either her physician or her counselor after May 12th.  Vosler Aff. ¶ 4; Pl. Br. at 18.  Caskey had missed work for all sorts of reasons in the past and had both worked and taken vacation days in the intervening time period.  Hill's knowledge of Caskey's FMLA leave from late April to mid-May was no substitute for proper notice about her absences in late May, let alone a substitute for a showing that a serious health condition rendered her unable to perform her job.

Caskey makes several arguments in an attempt to shift the burden back to Hill's on this issue.  Caskey suggests that Hill's had a duty to call and inquire about her condition to find out if her absences might warrant FML.  She also argues that Hill's had a duty to provide her with an FMLA packet or other information.  Caskey Aff. ¶¶ 281, 283.  Caskey also contends that she was improperly terminated before she had an opportunity to turn in FML papers. Each of these arguments fails.  Because Hill's did not have notice that Caskey's leave might be FMLA-qualifying, it was not required to provide Caskey with FMLA information or to give her fifteen days to submit a certification under 29 C.F.R. § 825.305.  See *Levine*, 2002 WL 1800254, at *7.

Caskey also argues that because Hill's does not offer sick leave in addition to FMLA leave, any request for leave because an employee is "sick" is a request for FMLA leave.  Pl. Br. at 61.  This argument is misguided, because the FMLA requires protected leave only for serious health conditions.  See 29 U.S.C. § 2612. Hill's employees were granted vacation days and other forms of leave.  Under *Collins*, Caskey did not provide sufficient notice that her sickness was FMLA-qualifying.

E.   *Miscellaneous Complaints*

Caskey raises a host of other miscellaneous complaints about the way in which Hill's handled FMLA leave, but her arguments here fail as well.  First, Caskey argues that Hill's used FMLA absences to reduce the quarterly and yearly

attendance bonuses of technicians.  Caskey Aff. ¶¶ 124, 211 (Att. 80 – e-mail clarifying how attendance bonus is calculated and not excluding FML).  Caskey does not claim that she herself lost a bonus due to FMLA leave, except for her time-barred claim about 2000, so she cannot bring a claim under the FMLA on this basis.  Moreover, the regulations differentiate between bonuses that require performance on the part of the employee (*e.g.*, production bonuses) and those that do not (*e.g.*, perfect attendance or perfect safety).  While an employer may not disqualify an employee for the latter type of bonus because of FMLA leave, it need only give the same consideration for the former type of bonus that it gives to employees on other forms of paid leave.  See 29 C.F.R. § 825.215(c)(2).  There is no evidence that Hill's did not also reduce the quarterly and yearly attendance bonuses of technicians who took other forms of paid leave.  Indeed, the evidence is to the contrary.  See Caskey Aff. Att. 29 (Hill's policy document noting that jury duty, short term disability, FML, bereavement, illness, and military leave all count as missed time in calculating attendance bonus).

Second, Caskey argues that Hill's used FMLA absences to initiate and to extend the duration of IIPs.  See Caskey Aff. ¶¶ 122, 124, 317 (Att. 5 – memo stating that FML can be considered as a "data point" when evaluating a team member who has an absenteeism performance issue; Att. 126 – presentation stating that "any time missed against a weekly schedule will be considered an absence").  Caskey's only FMLA-protected absences are those for which she requested and received FMLA leave from Hill's:  from June 27 through

September 13, 2000; from April 5 through April 14, 2002; from December 13 through December 15, 2002; and from April 24 through May 12, 2003.  Caskey II Dep. at 85, Ex. 3.

Only Caskey's discipline in November 2001 and February 2003 were initiated for excessive absences.  Caskey has not identified evidence showing that protected absences were included in her counted absences and precipitated the discipline.  Also, Hill's contends that the FMLA permits employers to extend disciplinary periods in effect when an employee takes FML for the length of the leave.  See *Sawyer v. Ball Corp.*, 151 F.3d 1030, *2-3 (4th Cir. 1998) (unpublished) (affirming summary judgment in favor of employer where plaintiff alleged that employer violated FMLA by not counting FML toward disciplinary suspension or probationary period); but see *Schmauch v. Honda of America Mfg., Inc.*, 295 F. Supp. 2d 823, 831-33 (S.D. Ohio 2003) (plaintiff presented issue of fact as to whether extension of disciplinary period solely for taking FMLA leave discouraged such leave in violation of 29 C.F.R. § 825.220).  The court agrees with Hill's on this issue of law.  The IIP and PIP disciplinary processes serve as probationary periods to review employee performance.  An employer is entitled to review an employee's *on-the-job* performance for the full specified period, not merely for that period reduced by several weeks of absences.  The FMLA does not require an employer to cut short an otherwise justified probationary period simply because an employee has taken FMLA-protected leave.

Third, Caskey claims that Hill's violated the FMLA by posting all technician absences, including FMLA-related absences, at the Plant. See Caskey Aff. ¶¶ 122-23, Att. 28. Caskey does not argue why this is unlawful and there is no evidence that the practice was used to discourage FMLA leave. Finally, Caskey complains that Hill's did not post a notice at the Plant explaining FMLA provisions or providing information concerning procedures for filing complaints about violations of the Act. Caskey Aff. ¶ 122. Caskey argues that under 29 C.F.R. § 825.300(b), therefore, Hill's could not punish employees such as herself for failing to provide advance notice of need for FMLA leave. But Caskey was never denied leave or disciplined for failing to provide *advance* notice. She was penalized for failing to provide any notice or documentation at all. All of Caskey's grounds for her FMLA entitlement claim fail as a matter of law.

III.    *Title VII Discrimination Claim*

Title VII makes it unlawful to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, *terms, conditions, or privileges of employment*, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Caskey claims that Hill's discriminated against her on the basis of her sex in a variety of ways.

-26-

A.    *Time-Barred Events*

Hill's argues that claims based on events that took place prior to October 3, 2002, should be dismissed as time-barred because they occurred outside of the 300-day window before Caskey filed her EEOC charge.  See *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); see also *Hildebrandt v. Ill. Dep't of Natural Resources*, 347 F.3d 1014 (7th Cir. 2003).[3]

Caskey's general complaints about gender disparities in day-to-day assigned tasks and training are not time-barred.  See *Morgan*, 536 U.S. at 115 (similar to hostile environment claims, "[t]heir very nature involves repeated conduct."); *Hildebrandt*, 347 F.3d at 1035-36 (considering plaintiff's general allegations of unequal treatment as part of single hostile environment).  Caskey essentially argues that Hill's maintained a system throughout the course of her employment that allowed male technicians to take advantage of specialized training and to assign undesirable tasks to their female co-workers.  She does not challenge any one-time adoption of an official discriminatory policy.

On the other hand, *Morgan* held that any discrete acts of discrimination (not part of a hostile environment claim) that fall outside the 300-day statute of

---

[3]Hill's states that Caskey filed her EEOC charge on July 30, 2003, and Caskey does not dispute that date.  Caskey's complaint, however, states that she filed her charge on or about July 10, 2003.  Cplt. ¶ 30.  Neither party has submitted the relevant charge as evidence.  The court need not resolve the discrepancy because the same events would be time-barred under either date.

limitations period are time-barred even if they relate to other discrete acts that fall within the limitations period.   536 U.S. at 111-13.   The Court gave specific examples of discrete acts:  termination, failure to promote, denial of transfer, and refusal to hire.  *Id.* at 114; see also *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 724 (7th Cir. 2004).

Caskey relies on several discrete events that are clearly time-barred.  First, Caskey alleges that at the end of November 2001, she and another female technician were told by a team leader that they would be written up for attendance problems.  Caskey alleges that several males who had more absences were not told that they would be written up.  Caskey Aff. ¶ 137.  While this allegation fails for other reasons (most basically, being told that one will be written up is not ordinarily a materially adverse employment action), it is also time-barred under Title VII.

Second, Caskey claims that her February 2002 PIP was "back-dated" to November 2001, and she argues that males were not put into the disciplinary process "retroactively."  Caskey Aff. ¶¶ 139-40, Atts. 33 & 34.  Caskey also claims that sixty-four hours of her absences were for bereavement leave, and that this type of leave was not held against males for attendance purposes.  Caskey Aff. ¶ 138.  All of these allegations are time-barred under Title VII.  Hill's decision to discipline Caskey in February 2002 for excessive absenteeism was a discrete act that occurred outside the relevant limitations period.  It does not matter that the

discipline might have later affected Caskey's employment relationship with Hill's during the limitations period.  See *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) (employee's separation prior to limitations period because of alleged discriminatory policy did not support claim for continuing violation where employee was rehired and lost seniority credit as a result), cited by *Morgan*, 536 U.S. at 112, and *Reese v. Ice Cream Specialties, Inc.*, 347 F.3d 1007, 1011 (7th Cir. 2003); see also *Brown v. Colgate-Palmolive Co.*, 2006 WL 517684, *10 (S.D. Ind. Mar. 2, 2006) (concluding that defendant's PIP/IIP constituted a discrete act under *Morgan*).

Finally, Caskey claims that in August 2002 she applied for and was denied a technician position in Special Projects, and that the position was given to a male co-worker (William Vance).  Caskey Aff. ¶¶ 70, 147.  Caskey claims that the position would have constituted a promotion because it paid more, provided more overtime, and did not require rotating shifts, but the evidence on which she relies for this point is unclear and unauthenticated.  See Caskey Aff. Att. 51 (chart with a handwritten note next to Vance's name stating "salary increase 9/8/02?").  In any event, Caskey's own evidence demonstrates that Vance's acceptance of the position occurred before September or October 2002 and therefore her claim is time-barred.  See *Morgan*, 536 U.S. at 114 (characterizing "denial of transfer" and "failure to promote" as easily identifiable discrete acts).

B.    *Disparate Treatment*

Caskey offers no direct evidence of discriminatory intent on the part of Hill's.  To establish a prima facie case of sex discrimination under the indirect method of proof, Caskey must show:  (1) she was a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she was subjected to an adverse employment action; and (4) she was treated less favorably than similarly situated male employees.  *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).  If Caskey can establish a prima facie case, Hill's must articulate a legitimate, non-discriminatory reason for its actions, and Caskey must then respond by showing that Hill's reason is really a pretext for discrimination.  *Rhodes*, 359 F.3d at 504.

Caskey's Title VII allegations fall into three categories:  (1) she received discipline that similarly situated males did not receive;  (2) male technicians were assigned easier and more favorable tasks than female technicians, and they were trained in certain tasks in which female technicians did not receive training; and (3) male employees were given credit for her suggestions about plant improvements.[4]

---

[4]Caskey also testified that Hill's "gave male employee Ron Thomas 620 hours of FMLA leave in one year when he was not seriously injured, but the plant failed to give [her] FMLA when [she] broke [her] wrist, [her] shoulder was in pain, and [she] was severely depressed."  See Caskey Aff. ¶ 313.  The court interprets this testimony to be an allegation of discrimination based on sex.  But Caskey (continued...)

1.   *Discipline*

(a)   *February 2003 Performance Agreement*

On February 27, 2003, Caskey was put into a second-stage IIP for having eighty-four hours of non-FMLA absences during the rolling calendar year, reflecting an absenteeism rate in excess of 3%.  Caskey Aff. Att. 62; Keinath Aff. ¶¶ 4-6.  The Plant practice during 2003 was to discipline employees who exceeded an absenteeism rate of 2.12%.  Keinath Aff. ¶ 7.

Caskey testified generally that "[s]everal male employees had more absences than [she] had and they were not disciplined."  Caskey Aff. ¶ 312.  Caskey does not identify any of these male employees.  Instead, she persistently argues that Hill's has not identified any similarly situated males who were treated worse than her.  See, *e.g.*, Pl. Br. at 34, 41, 49.  Caskey's argument misunderstands her burden of proof at the summary judgment stage:  Hill's is not required to come forward with evidence of male employees who were treated worse than Caskey; rather, she has the burden of identifying similarly situated males who were treated more favorably.

---

[4](...continued)
offers no evidentiary support for this statement other than her own testimony, and her testimony is not specific enough nor demonstrably based on personal knowledge to be admissible.  *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."), citing *Hadley v. Du Page County*, 715 F.2d 1238, 1243 (7th Cir. 1983).

Caskey has not met this burden.  The only evidence she cites on the issue is a chart attached to her affidavit, which she alleges shows technician absences for one year beginning on September 27, 2002.  See Caskey Aff. Att. 123.  This chart is unauthenticated hearsay evidence and gives no indication as to whether the absences were authorized or whether employees were disciplined as a result of their absences.  It also does not match the rolling calendar year period used to calculate Caskey's absences.

In addition, Caskey has not offered evidence from which a jury could find that Hill's stated reason for disciplining her was pretextual.  Caskey points out that she skipped the first stage of IIP.  But Keinath testified that Caskey was put directly into the second stage because of her level of unexcused absences and because she had only recently exited an IIP for similar absenteeism problems. Keinath Aff. ¶ 9.  Plant Manager Zaleha testified that Hill's retains discretion to advance a technician in the disciplinary process if circumstances warrant.  Zaleha Aff. ¶ 9.  Caskey offers no evidence or argument in response, and therefore she cannot show that her discipline in February 2003 was discriminatory.

      (b)    *March 2003 Decision-making Leave*

Caskey also cannot make out a  prima facie case of discrimination based on her March 2003 decision-making leave.  Caskey's leave paperwork discussed her discipline history and noted her "pattern of absenteeism over the past 2 years." See Caskey Aff. Att. 72.  Hill's stated that Caskey had not shown adequate

improvement despite "several opportunities" for correction.  Hill's also identified two more recent problems.  First, Hill's claimed that Caskey had exhibited "at-risk behavior" in performing equipment maintenance on an extruder machine in February 2003.  See also Caskey Aff. Att. 63.  Second, Hill's claimed that on March 5th, Caskey allowed over 50,000 pounds of defective product to be produced on the extruder line for which she was responsible for conducting periodic quality checks.  Caskey's paperwork stated that these "latest two actions continue to violate the company's principles/values."

Caskey argues that both of the more recent incidents were not her fault. She testified that there was no "at-risk" side of the extruder and that after her injury, she was asked to write a standard operating procedure for replacing an extruder die.  Caskey Aff. ¶¶ 175-77, 180-82.  Caskey also testified that the defective product problem was caused by a surge in the machine.  Id. ¶ 185.  She testified that she shut down the machine three or four times during her shift to try to solve the problem, but she was told by a shift optimization technician, technical systems, and computer integrated manufacturing to keep it running. Id. ¶ 190.  Caskey testified that none of these parties were able to solve the problem and that no managers were present during her shift.  Id. ¶¶ 186-89. Caskey claims that she performed all required quality checks but that she could not constantly perform checks because she had to perform other functions on the machine.  Id. ¶ 193.

In cases alleging discriminatory discipline, the plaintiff need not always show that she was a model employee.  An employer may violate Title VII by disciplining an employee more harshly because of her sex.  Thus, where a plaintiff alleges discriminatory or retaliatory discipline, "the second and fourth prongs of *McDonnell Douglas* merge."  *Lucas*, 367 F.3d at 728, citing *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002), and *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999).  Accordingly, the court need not decide whether Caskey was meeting Hill's legitimate expectations at the time of her March decision-making leave.[5]

Nevertheless, Caskey cannot establish a prima facie case of discrimination because she has not identified any male employees who were treated more favorably despite engaging in similar conduct.  In differential discipline cases, a plaintiff must show that she was situated similarly to a male employee with respect to performance, qualifications, and conduct.  *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 546 (7th Cir. 2002); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).  This typically requires a showing that the two employees dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct without differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment

---

[5]The evidence offered by Hill's – Caskey's letters of recommitment to the plant while on decision-making leave (See Caskey II Dep. Ex. 1: "My performance so far has not lived up to Hill's standards") – are not dispositive on this issue, because writing a recommitment letter appears to have been a condition for keeping one's job while on leave.

of them.  *Radue*, 219 F.3d at 617-18.  To meet her burden of identifying a similarly situated employee, Caskey must identify a male co-worker who is directly comparable to her in "all material respects."  *Grayson*, 308 F.3d at 819.

Caskey points to other males who were injured at work and not put into an IIP (see Caskey Aff. ¶¶ 314-16, Att. 125), but she has not identified any male technicians who were injured at work, were accused of causing production of defective product, *and* had a similar level of absenteeism but were not disciplined. In fact, Caskey cannot identify any technician – male or female – who shares these characteristics.  Hill's acknowledges that it does not put technicians into an IIP for just one or two reportable accidents, see Caskey Aff. Att. 125 (Jim Miller report), and Caskey's evidence is not inconsistent with that alleged policy.  Caskey has failed to raise a genuine issue of fact regarding the fourth element of her prima facie case.

Also, none of the evidence cited by Caskey would allow a reasonable jury to find that Hill's reasons for disciplining her were pretextual.  To show pretext, Caskey must present evidence that would allow a jury to find that the Hill's managers who made the decision to discipline her did not honestly believe that she had committed the behavior of which she was accused or that the behavior was not the real reason for their decision.  She has not presented such evidence.

First, Caskey has not shown pretext merely by arguing that there was no "at-risk" side of the extruder. An incident investigation team comprised of several of Caskey's co-workers concluded that she was standing on the "at-risk" side of the extruder at the time of her accident. Caskey argues that Keinath and her team leader "influenced" the other members of the team to reach this conclusion. Her argument is based on sheer speculation and anyway does not implicate discrimination. Caskey has offered no evidence of discriminatory bias on behalf of any of the Hill's employees who were charged with investigating her accident. Cf. *Russell v. Bd. of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336, 342 (7th Cir. 2001) (decision-making process tainted by supervisor's improper motives because of supervisor's active involvement in process was sufficient evidence of pretext to survive summary judgment); see also *Alexander v. Wisconsin Dep't of Health and Family Services*, 263 F.3d 673, 684 (7th Cir. 2001) (summary judgment is generally inappropriate where plaintiff can show that employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action); *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994).

Similarly, Caskey has not shown pretext merely by pointing out that she was the only employee disciplined in relation to the defective product incident on March 5th. Caskey admits that the extruder line ran defective product and that at least some of this product reached the Packaging area. Caskey II Dep. at 124. She also admits that part of her job as an extruder operator was to keep defective

-36-

product from reaching Packaging. *Id.* at 132-33. Caskey has not shown pretext simply by presenting evidence that she did her required quality checks and asked others for help, and by arguing that no more could be expected of her. The Seventh Circuit has repeatedly cautioned in employment discrimination cases that federal courts do not sit as super-personnel departments to re-examine an employer's business decisions. *E.g.*, *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005); see also *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1114 (7th Cir. 1998) (employee's self-appraisal of his or her performance cannot create issue of fact on honesty of supervisor's assessment). Hill's chose to hold Caskey, as the extruder operator, singly responsible for the defective product. There is no evidence that its decision was based on impermissible discriminatory motives.

Caskey argues that male technicians, presumably working as extruder operators, had run defective product in the past but were not disciplined. Caskey II Dep. at 108, 112-14, 133-34 (testifying about Mike Witham, Joel Reece, and Mike Holt). If supported by evidence, such an allegation could demonstrate pretext. *E.g.*, *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 n.3 (7th Cir. 1998) ("There is no doubt that selective enforcement of company policies against one gender and not the other would constitute sex discrimination under Title VII."). But Caskey has not provided sufficient evidence about the circumstances of any of these men for a reasonable jury to conclude that they were similarly situated to her. Caskey has not presented evidence about the amount of bad

product they produced or whether that product reached Packaging.  At least in the case of Reece, Caskey testified that his product did not reach the Packaging area. Caskey II Dep. at 108.

For purposes of the pretext inquiry, "[a]rguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are '*right* but whether the employer's description of its reasons is *honest*.'" *Jones v. Union Pacific R. Co.*, 302 F.3d 735, 744 (7th Cir. 2002), quoting *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir.1997), quoting in turn *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992) (emphases in original).  Caskey has presented no evidence that any of Hill's reasons for putting her into DML were dishonest and therefore a pretext for discrimination.

(c)     *May 2003 Decision-making Leave*

Caskey has made no effort to explain how Hill's decision to extend the end-date of her original decisionmaking leave in May 2003 was discriminatory. Instead she merely argues that she did not deserve the discipline.  Caskey's argument is misguided.

First, Caskey has not even attempted to establish a prima facie case of discrimination.  At the very least, she has failed to identify any similarly situated males who were treated more favorably.

Even if Caskey could establish a prima facie case of discrimination, she has not offered evidence that Hill's stated reason for renewing her DML was pretextual. Hill's contends that Caskey was disciplined for failing to comply with the terms of her original DML.  Caskey's March DML explicitly required that she "[h]ave no absences and use no emergency vacation time for the duration of the agreement." Caskey Aff. Att. 72 at 4.  On April 10, 2003, Caskey left Indiana to drive to Texas and attend the graduation of her cousin's friend.  Caskey II Dep. at 16-17.  On the morning of April 12th, Caskey called the Plant to request vacation time for her scheduled shift on April 14th.  *Id.* at 14-15, 19.  Caskey admits that she called in less than 48 hours before the start of shift.  See Pl. Br. at 16 (acknowledging that Caskey called her team sometime between 6:00 a.m. and about 10:00 a.m.); see also Caskey Aff. ¶ 224.  In any event, it is difficult to see how a trip to Texas to attend the graduation of a cousin's friend would amount to "emergency" vacation.[6]

---

[6]As defendants point out, Caskey's testimony about the time of her call and with whom she spoke on April 12th has changed over the course of this case.  In her first deposition, Caskey testified:  "I called Carolyn Thomas and Chris White on Saturday morning at ten o'clock.  I was four hours off my 48-hour time.  I didn't want to call them at six o'clock in the morning.  And I called [team leader] Krista Doyle."  Caskey I Dep. at 77-78.  In her second deposition, Caskey testified: "I called in work at 6:30 in the morning and told them that I would not be there on my next day . . . Krista – I did not talk to Krista.  I talked to Chris White on the phone that morning. . . .  I never talked to Krista Doyle."  Caskey II Dep. at 14-15. Caskey later suggested that she was only fifteen minutes late in calling.  Caskey II Dep. at 70.  Also see Caskey Aff. ¶ 216 (testifying that she called Krista Doyle), ¶ 224 (testifying that she called team members and team leader "sometime between 6:00 a.m. and 10:00 a.m.").  Caskey may not create a genuine issue of fact by relying on her own internally contradictory deposition and affidavit testimony.  *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 505 n.5 (7th Cir. 2004).

Caskey makes several arguments to avoid the obvious result of her admission.  Caskey argues that Hill's requirement that she take no emergency vacation time was unreasonable and that "[she] was not told what emergency vacation was or what [she] was supposed to do in an emergency."  Caskey Aff. ¶ 222.  Caskey also claims that another "general rule" allowed employees to call in during the first four hours of their shift, however she specifically admitted that her DML required that she not take emergency vacation without forty-eight hours notice.  Caskey II Dep. at 14-15.  Finally, Caskey claims that her team had no objections to her taking the day off and that she was "in substantial compliance" with the forty-eight hours rule.

None of Caskey's arguments suggest that Hill's interpretation of its policy in her case was inconsistent or factually baseless and therefore that its offered reason for disciplining her was pretextual.  Hill's forty-eight hours notice rule was a reasonable requirement which Caskey failed to meet.  See *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997) ("it is no business of the court in a discrimination case to decide whether an employer demands 'too much' of his workers").  Caskey has not shown that Hill's extension of her original decisionmaking leave was discriminatory.

(d)    *May 2003 Termination*

Finally, Caskey has not offered sufficient evidence from which a reasonable jury could conclude that her termination in May 2003 was discriminatory.  Caskey

has failed to raise a genuine issue of fact as to whether she was meeting Hill's reasonable expectations at the time she was terminated because the undisputed evidence shows that she violated the terms of her decision-making leave by failing to notify her area leader of her absences and by taking unexcused absences. Also, Caskey has not identified any similarly situated male employees who were not terminated for similar conduct.

Caskey argues that she had scheduled May 22nd as a vacation day. Caskey Aff. ¶¶ 287, 304. This argument is not dispositive, since even one unexcused absence would have been sufficient to terminate Caskey under the terms of her DML. Caskey also argues that she had vacation days available to her at the time of her absences. But even if the court assumes that Caskey had vacation days available because her short-term disability had been approved for her absences from April 24 through May 12, it would not matter. See *id.* ¶¶ 279-80. Caskey would have violated the terms of her DML by taking emergency vacation time for her absences on May 21st and 27th.

Because Caskey cannot establish a prima facie case of discrimination as to her termination, the court need not address the parties' arguments about pretext. See *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002) ("A plaintiff does not reach the pretext stage, however, unless she first establishes a prima facie case of discrimination."); *Jones v. Union Pacific Railroad Co.*, 302 F.3d 735,

741 (7th Cir. 2002) (establishing a prima facie case of discrimination is a condition precedent to pretext analysis).

2. *Training and Work Assignments*

Caskey testified that female technicians at the Richmond Plant were typically assigned to do the "dirty work" of daily cleaning, while men were assigned to the "easier" job of preventive maintenance, which involved oiling and adjusting machines and which gave men specialized training. Caskey Aff. ¶¶ 42, 53. Caskey testified that she wanted to do specialized projects and preventive maintenance but was not allowed to do so because the male technicians would not train female technicians on preventive maintenance. *Id.* ¶ 56. Technicians at the Hill's plant worked in teams in which the members were expected to manage themselves cooperatively to accomplish the needed work. Caskey testified that "[o]ne time in about 2002," she told the men at the plant that she was coming in over a holiday for the tear-down of a machine, but the men in charge ignored her and did not teach her anything. *Id.* ¶ 61.

Caskey testified that cleaning was supposed to be performed by all employees during their shifts while performing their regular jobs and operating their machines, but that the male technicians usually told the female employees to clean while they continued to operate their machines or do preventive maintenance. Caskey Aff. ¶ 53. She testified that there were also shut-down days

when men did preventive maintenance and women were required to clean the work areas.  *Id.* ¶ 55.

In 1997, Caskey complained to her team leader that five men were sent for extruder training, but she was not sent.  She testified that she never was allowed to go to training for the extruder that she operated.  Caskey Aff. ¶¶ 67-68.  Caskey acknowledged that there was no formal training in preventive maintenance, but she also testified that men did not provide on-the-job training in preventive maintenance to female employees.  *Id.* ¶¶ 58-59.  Caskey did learn some preventive maintenance on her extruder just by operating it and being present during its operation.  *Id.* ¶ 63.

Caskey testified that she did not like cleaning "all the time" while the men did preventive maintenance.  Caskey Aff. ¶ 52.  But Caskey acknowledges that she never asked to do preventive maintenance because she did not want to "be held responsible for stuff" that she did not understand.  See Caskey I Dep. at 54-55.  Caskey was offered the role of preventive maintenance point person in 2003 but declined the position.  *Id.* at 55-56.  She said that she did so because she was not trained for the position and "did not want to harm [herself] or others."  Caskey Aff. ¶¶ 64-65.

Caskey's complaints about alleged disparities in work assignments and training do not rise to the level of adverse employment actions under Title VII.  "A

materially adverse employment action is something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Rhodes*, 359 F.3d at 504, quoting *Crady v. Liberty Nat'l Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993). A materially adverse action can be indicated by termination of employment, demotion, a less distinguished title, material loss of benefits, significantly diminished responsibilities, or other indices unique to a particular situation. *Hildebrandt*, 347 F.3d at 1033 n.13, citing *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002). Not everything that makes an employee unhappy qualifies as a materially adverse action, and adverse employment actions are typically economic injuries. *Whittaker v. Northern Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005).

First, technician compensation and benefits at Hill's did not vary by area or work assignment. Zaleha Aff. ¶ 7. Technicians were expected to work in all areas of the Plant, and the assignment of tasks germane to one's job is typically not an adverse action under Title VII. See *Rhodes*, 359 F.3d at 505 (affirming summary judgment on finding of no materially adverse employment action under Title VII where plaintiff complained of assignments and tasks consistent with the job duties of her position); *O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) (lateral transfer resulting in assignment of responsibilities that were within the reasonable scope of plaintiff's duties did not constitute an adverse employment action under Title VII); *Crady*, 993 F.2d at 135-36 (lateral transfer to position with same salary, benefits, and level of responsibility did not constitute materially

adverse employment action under Title VII).   Moreover, the cleaning and preventive maintenance tasks about which Caskey complains were merely ancillary responsibilities to the technicians' main responsibilities in Processing or other areas of the plant.   Uneven allocation of these tasks would not qualify as job segregation.   Caskey's subjective preference to perform some but not other technician tasks does not establish an adverse employment action under Title VII. See, *e.g.*, *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (plaintiff must show some change in the terms or conditions of employment that is more than a "mere subjective preference").

Second, to demonstrate a discriminatory failure to train, Caskey must show that (1) she is a member of a protected class; (2) her employer provided training; (3) she was eligible for training; and (4) she was not provided training under circumstances giving rise to an inference of discrimination, *i.e.*, she was denied training given to similarly situated male employees.   See *Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000).   Caskey's allegation about extruder training in 1997 is clearly time-barred.   In addition, her general complaint about a denial of training in preventive maintenance appears to be no more than a recast of her complaint about the assignment of tasks.   Caskey acknowledges that Hill's did not provide formal training in preventive maintenance to men or women.   See Caskey Aff. ¶ 58.   Finally, there is no evidence that any absence of training had a negative impact on Caskey's job and therefore it was not a materially adverse action under Title VII.   Accord, *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d

520, 528-29 (7th Cir. 2003) (plaintiff did not challenge district court's finding that denial of training had no tangible, negative impact on plaintiff's employment).

In sum, Caskey's general complaints about assignments and training did not alter the terms and conditions of her employment within the meaning of Title VII. See *West v. Maxon Corp.*, 2001 WL 1712511, *3 (S.D. Ind. Dec. 10, 2001) (female plaintiff's complaints, among others, that she had to teach herself certain skills and perform the "hard" jobs when she worked with men were "clearly not the type of things Congress contemplated as adverse employment actions").

### 3.  *Credit for Suggestions*

Caskey claims that Hill's took her suggestions for plant improvements and gave credit for them to male employees. In her deposition, Caskey testified that she made a suggestion to Haverkamp about installing an auger in Processing to salvage product that was used for density checks. Caskey II Dep. at 99-102. Caskey claims that Hill's gave credit to Vince Sams for this idea. See Caskey Aff. ¶ 309, Att. 120 (company newsletter after Caskey's termination discussing Vince Sams' involvement in "Density Reclamation" project). Caskey also testified that she should have received credit for a suggestion she gave to Plant management in 2000 about diverting product back to Dry Mix bins. Caskey II Dep. at 103-06. Caskey testified that Fred Stockberger got credit for this idea. In her affidavit, Caskey testified that Vince Sams also received credit for a suggestion she made about rotary valves on cooler shoots. Caskey Aff. ¶¶ 75-77. Caskey testified that

Hill's implemented this suggestion, and another suggestion of hers about dryer fines, after she was terminated.  Caskey Aff. ¶ 75, Att. 120 (company newsletter discussing Bernard Netus's involvement in "Dryer Damper Control and Fines Reclamation" project).

It is questionable whether Caskey can establish a prima facie case of discrimination based on these allegations.  The denial of credit for plant improvement suggestions may not be a materially adverse employment action under Title VII.  Caskey testified that male technicians received bonuses and awards for their suggestions, including trips to Colgate headquarters in New York.  Caskey Aff. ¶ 80.  She also testified that in the past, Sams and J.D. Wayne received stock options and cash for their ideas.  Caskey II Dep. at 102-03.  But Hill's decision to award such credit was discretionary and similar to the award of a bonus.  The Seventh Circuit's decisions show that denial of a discretionary bonus ordinarily will not qualify as an adverse employment action under Title VII.  See *Farrell v. Butler Univ.*, 421 F.3d 609, 614 (7th Cir. 2005) (distinguishing bonuses which generally are "sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer" from raises which "are the norm for workers who perform satisfactorily"), quoting *Hunt v. City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000); cf. *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) (denial of raise can constitute a materially adverse employment action if it would have been an expected element of the employee's salary and its denial cuts the salary in real terms).

The court does not rely on the material adverse action issue, however, because Caskey's evidence shows that three of the four ideas for which she claims credit were not fully implemented until after her termination.  See Caskey Aff. ¶ 75; Caskey II Dep. at 100-01 (testifying about Sams and Netus).  Caskey has not explained why Hill's should be required to reward a former employee for a suggestion, or any employee prior to implementation of his or her suggestion. Caskey's fourth suggestion was implemented in 2000, and any claim based on that event is time-barred under Title VII.  See Caskey II Dep. at 103-05 (testifying about Stockberger).  Caskey's discrimination claim cannot survive based on a denial of credit for plant suggestions.[7]

---

[7]Caskey's Title VII claim also cannot survive in the form of a hostile environment claim.  Caskey alleged in her complaint that defendants "harassed the female employees through sexual statements, sexual advances, sexual pictures, and other means."  See Cplt. ¶ 10; see also Docket No. 18 (parties' case management plan).  This allegation implicates a hostile environment claim under Title VII, but neither party discusses such a claim in their briefs.

Defendants have made clear that they seek summary judgment on all of Caskey's claims.  See Def. Motion for Summary Judgment (defendants "move for summary judgment on all claims") (Docket No. 32); Def. Br. at 25 (same) (Docket No. 33).  In such a situation, it is incumbent on Caskey to come forward with evidence demonstrating that her hostile environment claim should survive summary judgment.  *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 603-04 (7th Cir. 1989) (noting long-standing rule that party opposing summary judgment must inform the trial court of reasons, legal or factual, why summary judgment should not be entered).  To do so, Caskey must present evidence that would allow a reasonable fact finder to conclude that:  (1) she was subject to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and to create a hostile or abusive working environment; and (4) there is a basis for employer liability.  *E.g., Rhodes*, 359 F.3d at 505; *McPherson v. City of Waukegan*, 379 F.3d 430, 437-38 (7th Cir. 2004).

(continued...)

IV.     *Retaliation Claims*

    A.     *Title VII and FMLA Retaliation Claims*

Title VII prohibits employers from punishing employees for complaining about discrimination or otherwise opposing practices that violate Title VII. 42 U.S.C. § 2000e-3(a); *Moser v. Indiana Dep't of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005). Similarly, the FMLA prohibits employers from retaliating against employees who oppose practices made unlawful by the Act. 29 U.S.C. § 2615(a)(2); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). It also prohibits employers from discriminating against employees who have taken

---

[7](...continued)

Caskey's 319-paragraph affidavit contains eight paragraphs of testimony relevant to a hostile environment claim. See Caskey Aff. ¶¶ 81-88. Caskey has not cited or discussed this evidence, but the court has considered it in its totality. Caskey's testimony recites some sophomoric sexual comments by a male technician, one relatively innocuous comment by the operations manager, and an allegation that she saw pornographic pictures on the computer screens of "male employees" in 2001. She also testified to hearing vulgar language by unidentified "male employees."

Even when this evidence is viewed in the light most favorable to Caskey, no reasonable fact-finder could conclude that any alleged sexual harassment was so severe or pervasive to alter the conditions of her employment and create a hostile working environment. A hostile work environment claim requires proof that goes beyond evidence of an uncomfortable or unpleasant work environment. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 977 (7th Cir. 2004); *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005) (affirming summary judgment on Title VII hostile environment claim in favor of employer where co-workers' behavior was "more reflective of run of the mill uncouth behavior than an atmosphere permeated with discriminatory ridicule and insult"). Title VII is not a "'general civility code' designed to purge the workplace of all boorish or even all harassing conduct." *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001), citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). While rude and tactless, the alleged actions of Caskey's co-workers do not rise to the level of actionable sexual harassment.

FMLA leave. *King v. Preferred Tech. Group*, 166 F.3d 887, 891 (7th Cir. 1999), citing 29 C.F.R. § 825.220(c). For the reasons explained below, no reasonable fact-finder could conclude from the evidence that Hill's retaliated against Caskey for exercising either her Title VII or FML rights.

The Seventh Circuit uses the same standards to evaluate Title VII and FML retaliation claims. *Buie*, 366 F.3d at 504 n.3. Under the direct method of proof, Caskey must present direct evidence of (1) a statutorily protected activity; (2) an adverse action taken by Hill's; and (3) a causal connection between the two. *Moser*, 406 F.3d at 903-05 (Title VII retaliation claim); *Buie*, 366 F.3d at 509 (FML retaliation claim); see also *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir. 2002). Under the indirect method, Caskey must show that: (1) she engaged in statutorily protected activity; (2) she was performing her job according to Hill's legitimate expectations; (3) despite meeting those expectations, she suffered an adverse employment action; and (4) she was treated worse than a similarly situated employee who did not engage in statutorily protected activity. *Moser*, 406 F.3d at 903-05; *Buie*, 366 F.3d at 503; see also *Stone,* 281 F.3d at 642. If Caskey could establish a prima facie case under the indirect method, the burden would then shift to Hill's to articulate a legitimate, non-discriminatory reason for its actions. If Hill's could do so, the burden then would shift back to Caskey to present evidence that could allow a reasonable jury to find that Hill's stated reason was not a true reason, but a pretext, which might allow an inference of retaliatory intent.

1.    *Statutorily Protected Activity*

Caskey has presented evidence that she engaged in statutorily protected activity.  First, she requested and received FML for various conditions from June 27 through September 13, 2000; from April 5 through April 14, 2002; from December 13 through December 15, 2002; and from April 24 through May 12, 2003.  Caskey II Dep. at 85, Ex. 3.  Caskey has not argued that she suffered retaliation under the FML for opposing practices made unlawful by the Act.  For example, she has offered no evidence that she requested FML, Hill's denied FML, and then she was retaliated against for complaining about the denial of leave.

In addition, Caskey has presented evidence that she engaged in activity protected by Title VII.  Caskey engaged in protected activity by supporting the discrimination complaints of her co-worker Carol Isaacs.  Isaacs had filed a charge of sex discrimination with the EEOC against defendants in July 2002.  Zaleha Aff. ¶ 16.  Caskey testified that about once a month from November 2002 through May 2003, she attended team meetings where employees discussed Isaacs' complaints.  Caskey told them that she thought Isaacs was right and that she supported her.  Caskey Aff. ¶ 104.  Caskey testified that, on some occasions, members of the leadership team (including the operations manager, the human resources manager, and the plant manager) attended these meetings.  *Id.*[8]

---

[8]None of Caskey's other actions qualify as an exercise of protected activity under Title VII.  Caskey alleges that she engaged in protected activity in November 2002 in relation to a meeting about quality investigations.  Caskey II Dep. at 151-
(continued...)

2.    *Adverse Employment Actions*

Under either method of proof, Caskey also must show that she suffered an

adverse employment action.  Caskey has not articulated clearly which actions by

_____

[8](...continued)

66; Caskey Aff. ¶¶ 107-08 (remarks made during meeting and after meeting to Isaacs).  Caskey's cryptic remarks demonstrate only that she expressed a desire for more involvement in the quality investigation process and provide no context from which a jury could find that they were offered in opposition to any alleged discriminatory actions on the part of Hill's.  See, *e.g., Comiskey v. Auto. Indus. Action Group,* 40 F. Supp. 2d 877, 898 (E.D. Mich. 1999) ("In order to engage in a protected opposition activity under Title VII . . . , a plaintiff must make an overt stand against suspected illegal discriminatory action.").

Caskey also cannot rely on her comments to team leaders Fred Stockberger and Everett Jenkins or co-worker Chris Penland for her retaliation claim.  See Caskey Aff. ¶¶ 89-90 (complaining to Stockberger about differential treatment of female employees); Caskey II Dep. at 162, 209-10; Caskey Aff. ¶ 105 (expressing support for Isaacs to Jenkins in November 2002); Caskey I Dep. at 10; Caskey II Dep. at 167-69; Caskey Aff. ¶¶ 111-15 (telling Penland in March 2003 that she supported Isaacs and would talk to her).  Typically, there can be no causal link between a plaintiff's protected activity and discipline if the *employer* was unaware of the protected activity.  See *Durkin v. City of Chicago,* 341 F.3d 606, 614 n.4 (7th Cir. 2003) (employer's awareness of protected activity is an implicit element in prima facie retaliation case); *Dey v. Colt Const. & Dev. Co.,* 28 F.3d 1446, 1458 (7th Cir. 1994).  Even if Caskey's complaints to Stockberger, Jenkins, and Penland could be considered specific enough to constitute protected activity, Caskey has offered no evidence (direct or circumstantial) to suggest that the relevant Hill's decisionmakers were made aware of any of these complaints.  The same holds true for her vague testimony that she expressed support for Isaacs "[a]t least once a week" to other "employees."  See Caskey Aff. ¶ 116.

Finally, much of the other evidence from Caskey's affidavit (characterized as "complaints about different treatment of female employees") is about statements too vague to qualify as protected activity under Title VII. See generally Caskey Aff. ¶¶ 89-119.  For example, Caskey testified that she complained to Human Resources about doing cleaning tasks while the men did preventive maintenance, but she offers no time frame for this complaint.  Caskey Aff. ¶ 54. Caskey also testified that, in 1997, she complained to her "team leader" that five male employees were sent for extruder training but that she was not.  Caskey Aff. ¶ 67.  She has not identified to whom she directed these complaints so the court cannot assess whether they affected any later employment decisions.

Hill's she believes to be retaliatory or which of her own actions she believes to have precipitated that retaliation. In the more than one hundred collective pages of Caskey's briefs, the court has located only a few scattered sentences even suggesting a causal relationship between her protected activity and her discipline, even though causation is obviously a necessary feature of any retaliation claim. In the section of her reply brief addressing her retaliation claims, Caskey argues: "Shortly after Caskey made statements supporting Isaacs, the defendants placed Caskey in Second-Stage IIP for false reasons and recommended that she be terminated for false reasons." Pl. Br. at 65. Similarly, in the introduction to her response brief, she states: "After Caskey had used FML and had supported Carol Isaacs, the defendants retaliated against her by making false allegations against her, by putting her in Second Stage IIP, by denying her FML, by making her a target for termination, by making three attempts to terminate her, and by terminating her." Pl. Br. at 3.

Based on these statements, the court considers only two alleged adverse employment actions to be part of Caskey's retaliation claims: her second-stage IIP in February 2003 and her termination in May 2003. Caskey's argument that Hill's made false allegations against her is vague rhetoric that cannot form the basis of a retaliation claim. And as discussed above, Hill's counted Caskey's absences as non-FML for legitimate, and not retaliatory, reasons. Finally, Caskey's mention of Hill's "three attempts to terminate her" is presumably a reference to Keinath's three termination requests. These requests are not adverse

employment actions within the meaning of Title VII.  Before Keinath's final request was approved in May, they had no effect on Caskey's employment.

### 3.   *Direct and Indirect Methods of Proof*

Caskey's retaliation claims cannot survive using the direct method of proof because Caskey has presented no evidence of a causal connection between her discipline and either taking FMLA leave or expressing support for Isaacs.  Caskey's claims also cannot survive under the indirect method of proof.   As discussed above, the undisputed evidence shows that every disciplinary action against Caskey was taken because she failed to meet Hill's legitimate work expectations.  In addition, Caskey has made no effort to identify males who did not engage in protected activity or Hill's employees who did not take FMLA leave who were treated more favorably.

Caskey suggests that she can rely upon allegedly retaliatory actions taken against other female employees who supported Isaacs.  See Pl. Br. at 65.  But this evidence cannot substitute for evidence establishing a prima facie case of retaliation against Caskey herself.  Caskey's Title VII and FMLA retaliation claims fail as a matter of law.

B.    *State Law Wrongful Termination Claim*

Caskey's state law retaliation claim also fails as a matter of law. Employment in Indiana is generally at-will. One exception to this rule is that "an employee who has been discharged in retaliation for filing a claim of workers' compensation may recover damages for wrongful termination." *Mack v. Great Dane Trailers*, 308 F.3d 776, 784 (7th Cir. 2002), citing *Frampton v. Central Ind. Gas Co.*, 297 N.E.2d 425, 428 (Ind. 1973). To survive summary judgment on such a claim, a plaintiff must present evidence that would support a finding that her termination was caused by filing for worker's compensation benefits. *Id.* Causation may not be inferred merely from evidence that (1) an employee filed for benefits and (2) she was fired. *Id.*

Caskey alleges that Hill's retaliated against her for having on-the-job injuries and for filing worker's compensation claims. Specifically she points out that she was put into a second-stage IIP in February 2003 "just six days" after she broke her wrist while at work. She also argues she was put into decision-making leave in March 2003 "because of" this injury and a previous wrist injury from July 2001. Caskey Aff. ¶¶ 178-79. Caskey received worker's compensation benefits for both of these injuries. See Caskey Aff. Atts. 31, 32, 112.

First, Caskey has not alleged that her discharge itself was in retaliation for filing a worker's compensation claim. Apparently, her argument is that Hill's retaliated against her by putting her into progressive disciplinary steps that

ultimately led to her termination (which, as discussed above, was for a different and wholly legitimate reason). It is doubtful that these allegations could form the basis of a wrongful discharge claim under Indiana law. See, *e.g.*, *Cripe, Inc. v. Clark*, 834 N.E.2d 731, 734 (Ind. App. 2005) (reversing denial of motion to dismiss retaliatory discharge claim on constructive discharge theory; recognizing that the few exceptions to at-will employment are "limited and strictly construed"); *Smith v. Elec. System Division of Bristol Corp.*, 557 N.E.2d 711, 712 (Ind. App. 1990) ("A successful litigant must demonstrate that his or her discharge was *solely* in retaliation for the exercise of a statutory right . . .") (emphasis added).

More important, there is no evidence of a causal connection between Caskey's worker's compensation claims and any of her discipline. Caskey's only argument in favor of causation is that her IIP and DML paperwork mentioned her on-the-job injuries. But the focus of this paperwork was clearly on the workplace behavior that led to her accidents, and not the resulting injuries or worker's compensation claims. No reasonable jury could infer causation from this evidence. See *Smith*, 557 N.E.2d at 712-13 (affirming summary judgment for employer on wrongful discharge claim where employee was discharged for excessive absences resulting from injury for which she happened to have received worker's compensation benefits).

*Conclusion*

Defendants' motion for summary judgment (Docket No. 32) is granted as to both defendants on all of plaintiff's claims.  Defendants' motion for oral argument on its motion (Docket No. 92) is denied.  Final judgment shall be entered accordingly.

So ordered.

Date: June 9, 2006

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Ellen E. Boshkoff
BAKER & DANIELS
eeboshko@bakerd.com

Jane A. Dall
BAKER & DANIELS
jane.dall@bakerd.com

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@fed-law.com

Rene M. Johnson
MORGAN LEWIS & BOCKIUS LLP
rjohnson@morganlewis.com

Susan W. Kline
BAKER & DANIELS
swkline@bakerd.com

George A. Stohner
MORGAN LEWIS & BOCKIUS
gstohner@morganlewis.com